# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 6046 | DATE | 11/1/2004 |
| CASE TITLE | Hackett vs. Clifton Gunderson | | |

MOTION:  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court denies both CG's motion for summary judgment and Hackett's motion for summary judgment (15,17). The date for filing the final pretrial order is extended to 11/29/04. The case remains set for trial on the joint trial call to begin 1/4/05.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | NOV 0 4 2004 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 29 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTINA HACKETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 03 C 6046 |
| ) | |
| CLIFTON GUNDERSON, L.L.C., ) | |
| ) | |
| Defendant. ) | |

DOCKETED
NOV 0 4 2004

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Christina Hackett has sued her former employer, Clifton Gunderson, L.L.C. ("CG"), for three claims based on CG's decision to terminate Hackett while she was on maternity leave. Hackett alleges the termination constituted unlawful pregnancy discrimination in violation of the Pregnancy Discrimination Act amendment to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; failure to return Hackett to work in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*; and unlawful retaliation in violation of the FMLA. This case is before the Court on CG's motion for summary judgment.

This case is also before the Court on Hackett's motion for summary judgment on CG's counterclaim. In its counterclaim, CG requests an award of the attorneys' fees incurred in successfully defending all or part of Hackett's lawsuit, as it argues is prescribed by the fee-shifting provision in Hackett's Employment Agreement.

For the reasons outlined below, the Court denies both motions for summary judgment.

1

29

**Facts**

CG is an accounting and consulting firm with offices in fourteen states and Washington, D.C. Hackett began working as a technology consultant at CG's Oakbrook, Illinois office on March 19, 2001. At the time Hackett was hired, CG serviced clients using both Blackbaud accounting software and its competitor, MIP software.

Hackett was initially hired and trained to provide consulting services to clients using Blackbaud in CG's Oak Brook location. But approximately one week into her job, Hackett elected to transfer with Michelle Scheffki, a partner, and two MIP consultants, Jacqueline Van Nice and Kim Backe, to the company's newly formed Joliet, Illinois office to provide consulting services to clients using MIP. Seven consultants remained in the Oak Brook office servicing Blackbaud clients. Scheffki, who was also the firm-wide Director of Technology Consulting, was the immediate supervisor of the Joliet consultants, including Hackett.

Hackett became pregnant with her second child a few months after she started working for CG, and in the fall of 2001, she announced her pregnancy to Scheffki. According to Hackett, Scheffki questioned her several times during her pregnancy about whether she would return to work after the birth of her second child, each time showing skepticism when Hackett announced her intent to return to work after taking maternity leave. Scheffki also allegedly expressed concern to Van Nice about Hackett's ability to handle two children and a job and what impact Hackett's pregnancy might have on the team.

Hackett continued to work until the birth of her daughter on April 2, 2002, when she began a twelve-week FMLA maternity leave. Hackett was scheduled to return to work on July 1, 2002. However, on June 27, 2002, Scheffki informed Hackett that the Joliet office was being

2

consolidated into the Oak Brook office, and as a result, Hackett was being terminated. At the time of her termination, Hackett was the sole consultant assigned to the Joliet office. Backe had resigned in March 2002, and Van Nice had resigned in June 2002. Joliet's MIP clients were transferred to the Oak Brook office.

CG asserts that Hackett was terminated due to the downsizing of the Oak Brook and Joliet technology practice and a neutral determination by Jim Thomas, a partner in the Oak Brook office, that the consultants employed in the Oak Brook office were capable of handling the transferred MIP clients in addition to their Blackbaum clients. Hackett alleges that CG was not experiencing a significant downturn in business at this time and that her termination was the result of pregnancy discrimination.

## Discussion

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To determine whether or not a genuine issue of material fact exists, the Court views the record in the light most favorable to Hackett, the non-moving party in this case, drawing reasonable inferences in her favor. *Id.* at 322.

### 1. Pregnancy Discrimination Claim

Hackett claims that CG violated Title VII because its decision to terminate her was motivated by her pregnancy. The Pregnancy Discrimination Act amended Title VII to establish that pregnancy discrimination falls within the ambit of Title VII's prohibition on sex

3

discrimination. *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001). The Act provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). Hackett can prove a pregnancy discrimination claim through either direct or indirect proof. *Venturelli v. ARC Community Servs. Inc.*, 350 F.3d 592, 599 (7th Cir. 2003). Because the Court finds that Hackett has provided sufficient evidence to defeat summary judgment under the indirect method, we need not address the merits of her arguments under the direct method.

Under the indirect approach, also known as the *McDonnell Douglas* burden-shifting method, a plaintiff must initially establish a prima facie case of discrimination. *Id.* at 602; *McDonnell Douglas Corp. v. Green*, 441 U.S. 792 (1973). To meet this burden, Hackett must provide evidence that (1) she was pregnant, and her employer knew it; (2) she was performing her duties satisfactorily; (3) she was discharged; and (4) similarly situated employees not in the protected class were treated more favorably. *Clay*, 253 F.3d at 1005. CG concedes for present purposes that Hackett has established a prima facie case of discrimination. Def's Mem. at 10.

The burden therefore shifts to CG to provide a legitimate, non-discriminatory reason for its adverse employment decision. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). For the purpose of the motion, Hackett likewise concedes that CG articulated a legitimate, non-discriminatory reason for her termination (i.e., a downturn in business). Pl's Mem. at 7.

To survive summary judgment, Hackett must rebut CG's articulated reason by providing evidence that it is merely a pretext for pregnancy discrimination. *Davis*, 368 F.3d at 784. In the

employment discrimination context, "pretext means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681 (7th Cir. 2000). Hackett must come forward with evidence showing either that CG's decision was motivated by a discriminatory reason or that CG's stated reason is unworthy of credence. *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003). The evidence need only "raise some doubt as to the genuineness of the given reasons for [her] termination" to preclude summary judgment. *Smith v. Cook County*, 74 F.3d 829, 831 (7th Cir. 1996).

Hackett points to numerous comments made by Scheffki during Hackett's pregnancy and maternity leave[1] as evidence that Scheffki's discriminatory animus was likely a motivating factor in her decision to terminate Hackett. Although Scheffki has denied making these remarks, CG assumes for the purpose of this motion that she made comments to both Hackett and Van Nice expressing skepticism as to whether Hackett would return to work after maternity leave and voicing her concern about Hackett's ability to handle her job responsibilities with two children.[2]

---

[1] CG contends that all of Scheffki's alleged comments were made before Hackett began her maternity leave, which would lend support to its argument that by the time CG made the decision to terminate Hackett, Scheffki was convinced she would return to work. Def's Reply to Pl's 56.1 Resp. ¶ 40. In support of this proposition, CG argues that "Van Nice corrects her testimony . . . to make clear that the comments attributed to Scheffki, while first said to have been made while Ms. Hackett was on maternity leave, were then said to have been made 'between the time Mickey would have known Tina was pregnant to the day Tina started her maternity leave.'" Def's Reply to Pl's 56.1 Resp. ¶ 19. However, the Court believes this is an inaccurate reading of Van Nice's deposition testimony. Van Nice makes it fairly clear that she was referring to comments made while Hackett was on maternity leave. It was the examining attorney who was responsible for the above quote, as she was initially mistaken about the time period to which Van Nice was referring. *See* Van Nice Dep. at 21-23.

[2] Specifically, on one occasion Scheffki asked Hackett how she knew she would be returning to work, because "it would be a lot more difficult with a second child." Hackett Dep. at 274-75. Scheffki also commented, in Hackett's presence, that a professional acquaintance "decided she was having other kids" and that she was now "on the mommy track." Hackett Dep. at 288-89. In addition, Van Nice testifies that immediately after learning of Hackett's pregnancy, Scheffki expressed concern to Van Nice about her pregnancy's impact on the MIP practice, exclaiming, "I don't know if this is going to work," Def's Reply at ¶¶ 16-17, and questioning whether or not "Tina would be able to handle all of that together." Van Nice Dep. at 19. Scheffki also commented "at least four or five times" in the midst of planning for future work, that "we can't assume Tina is going to be here" because "Tina doesn't know . . . that she's going to be returning when she goes on maternity leave." Hackett Dep. at 277-78, 283.

5

CG argues that Hackett has provided insufficient evidence to call into question the honesty of its explanation that she was terminated due to downsizing and the resulting elimination of her position. CG's principal contention is that personnel other than Scheffki made the decision to terminate Hackett and that there is no evidence that they were aware of Scheffki's comments or acted upon a prohibited animus.

According to CG, after the departure of Backe from the Joliet office, Scheffki began planning to move to CG's Peoria office. Def's 56.1 Stmt. at ¶ 40. Around this time, she recommended to Thomas, a partner in the Oak Brook office, that Oak Brook take back the MIP clients being served out of Joliet and transfer the two remaining Joliet MIP consultants, Van Nice and Hackett.[3] *Id.* In mid-June 2002, Thomas decided to accept the transfer of the Joliet MIP practice but not the transfer of Hackett, who was the sole consultant assigned to Joliet once Van Nice resigned earlier in June. Id. at ¶ 48.

Thomas testified that he based this decision on his assessment that the existing staff at the Oak Brook office had the capacity to handle the additional work created by the transfer of the MIP consulting practice, and "it was [his] intention . . . to protect and enhance the job security of the members of that consulting staff, because he knew them, was confident in their skills, and believed that they could handle the demands of an MIP consulting practice in addition to the Blackbaud consulting work that they would continue to have responsibility for." Def's 56.1 Stmt. at ¶ 46; Thomas Aff. ¶11. Thomas claims he also considered that the Blackbaud products

---

These are only a few examples of Scheffki's alleged conduct; the record contains numerous other allegations in addition to the ones included here.

[3] Scheffki testified that the intent had always been to transfer the Joliet MIP practice back to Oak Brook when she moved to the Peoria office. Scheffki Dep. at 56.

6

had been redeveloped and that Hackett would need to be retrained if she were to transfer to Oak Brook, where she would need to provide consulting services to both MIP and Blackbaud clients. Def's 56.1 Stmt. at ¶ 47; Thomas Aff. ¶ 12. Thomas denies that he considered Hackett's pregnancy or maternity leave in reaching his decision. Def's 56.1 Stmt. at ¶ 49; Thomas Aff. ¶ 14. CG claims that when Scheffki learned of Thomas's decision, she contacted Priority One, CG's human resources department, which determined there were no open technology consulting positions that might be available to Hackett, and directed Scheffki to terminate Hackett's employment due to the elimination of her position. Def's 56.1 Stmt. at ¶ 51-55.

The crux of the parties' dispute on the pretext issue turns on who made the decision to terminate Hackett, since, if Scheffki was involved in making the decision, a fact finder could more easily conclude that a discriminatory animus motivated the decision. Though statements voicing doubt that an employee will return to work after having a baby do not constitute direct evidence of pregnancy discrimination, *Illhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1156 (7th Cir. 1997) (citing *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994), these same statements may suffice under the *McDonnell Douglas* framework. *See Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 171 (1st Cir. 1998) ("Statements by supervisors carrying the inference that the supervisor harbored animus against protected classes of people or conduct are clearly probative of pretext."). Moreover, Scheffki's alleged statements go beyond doubting whether or not Hackett would return to work and appear to question her ability to handle her job after giving birth.

In employment discrimination cases, the plaintiff "must provide direct or circumstantial evidence that the *decisionmaker* has acted for a prohibited reason." *Rogers v. City of Chicago*,

7

320 F.3d 748, 754 (7th Cir. 2003) (emphasis in original). *Rogers* defines the decisionmaker as "the person 'responsible for the contested decision.'" *Id.* (quoting *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997).

Though the Seventh Circuit has made it clear that discriminatory feelings expressed by a non-decisionmaker are not evidence that the decision was made for discriminatory reasons, it has qualified this principle by observing that evidence of discriminatory animus by a person who provides input into an adverse decision may be relevant to show a discriminatory intent. *See Williams v. Seniff*, 342 F.3d 774, 790 (7th Cir. 2003); *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759 (7th Cir. 2001); *cf. Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1100 (7th Cir. 2001) (discussing in dicta that although the district court did not err in refusing to admit a non-decisionmaker's sexist statement as direct evidence of discrimination, "[i]t [could have been] argued, with a fair degree of plausibility, that the admission of [the non-decisionmaker's] statements would have been of some assistance to [plaintiff] in demonstrating pretext"). Hackett must provide evidence tending to show that Scheffki was directly involved in the termination decision or that she provided enough input to Thomas and Priority One that a jury reasonably could infer that her expressed discriminatory feelings provided the impetus for the termination.

The Court finds that there is a genuine factual dispute as to whether and to what extent Scheffki was involved in the decision to terminate Hackett, and that a jury reasonably could find that Scheffki's alleged animus motivated the termination decision. As Hackett points out, CG's narrative of the decisionmaking process has not been entirely consistent. In a February 21, 2003 letter to the EEOC regarding Hackett's charged discrimination, CG's counsel stated that "Michelle [Mickey] Scheffki [female/Director of Technology Consulting] recommended the

elimination of Ms. Hackett's position. The recommendation was authorized by Lauren Melensek [female/Chief HR Officer] and Kelly Renz n/k/a Guyder [female/Director of Staffing & Retention]." Pl's Ex N. This letter made no mention of Thomas's claimed role in the decision. Moreover, the admission that Scheffki recommended the elimination of Hackett's position undercuts CG's contention that Scheffki played no role in the challenged decision. "One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003); *see also Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 677 (7th Cir. 2003) ("[T]he consistency of the explanation provided by an employer at the time of an employment decision and in an administrative proceeding is evidence of the veracity of the employer's explanation at summary judgment.").

Because interpretive ambiguities must be resolved in favor of the nonmoving party on a motion for summary judgment, there is a genuine dispute over Scheffki's role in Hackett's termination decision. *Russell v. ACME-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995). Because this issue is central to the issue of pretext, the Court denies CG's motion for summary judgment.

Furthermore, besides providing evidence that her termination may have been motivated by discrimination, Hackett has also provided evidence sufficient to call into question the truthfulness of CG's proffered reason for terminating Hackett, bolstering her pretext argument. *See Zaccagnini*, 338 F.3d at 676. Hackett has provided evidence that the Joliet and Oak Brook offices did not experience a significant downturn in business while she was on maternity leave. She contends that before she left for maternity leave, business was brisk, Hackett Dep. at 347-358, and that there had even been discussion about hiring an additional consultant because they

9

"had so much work." Id. at 116; *see also* Van Nice Dep. at 26. Van Nice testified that in anticipation of being the lone consultant while Hackett was on leave, she discussed her workload with Scheffki, because she was afraid she would be unable to handle everything if she was the only consultant in the office. Van Nice Dep. at 26. Jodene Kunzik, the consultant in the Oak Brook office who ended up assuming responsibility for the transferred Joliet MIP clients (and who had no training in MIP), stated that she had plenty of work servicing Blackbaud clients and did not know how she was going to balance the workload for the two products. Pl's Ex. K at ¶¶ 5, 7.

Hackett also submits evidence that, if believed, would undercut CG's argument that it was downsizing and did not have a need for an additional consultant in the Oak Brook office. According to Van Nice, after she gave her two-week notice in June 2002 (just before Hackett was terminated), Steve Meindi called to ask her if she had any interest in staying at CG, perhaps as a Blackbaud consultant.[4] Van Nice Aff. ¶ 21. Van Nice also maintains that she had a meeting in September 2002 with a consultant in the Oak Brook office about joining that office's Blackbaud practice, although nothing materialized since Van Nice was employed elsewhere at that time. Id. ¶ 24-25. As Hackett had been trained in Blackbaud, but Van Nice had not, Van Nice's testimony lends some support to Hackett's claim that her pregnancy was a consideration in the decision. Pl's Resp. at ¶ 49.

In sum, Hackett has provided evidence from which a jury reasonably could find that CG lied about its reasons for terminating her. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368

---

[4] Contrary to CG's argument, this is not hearsay; Meindi's statement is admissible under Fed. R. Evid. 801(d)(2).

F.3d 776, 785 (7th Cir. 2004). Evidence that calls into question the truthfulness of the employer's stated reason precludes summary judgment. *Zaccagnini*, 338 F.3d at 676.

## 2.     FMLA Reinstatement Claim

Hackett's second claim is that CG's failure to return her to work after her maternity leave violated the FMLA. The FMLA provides that an eligible employee who takes leave under the FMLA shall be entitled upon return to be restored to her original position or an "equivalent position." 29 U.S.C. § 2614(a)(1); *Phelan v. City of Chicago*, 347 F.3d 679, 683 (7th Cir. 2003). To protect these substantive guarantees, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1); *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1017 (7th Cir. 2000). The FMLA does not, however, entitle any employee to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken leave." 29 U.S.C. § 2614(a)(3). Because Hackett was terminated while taking FMLA leave, the Court must determine whether the termination was illegally motivated by the employee's choice to take leave or by some other valid reason. *See Phelan*, 347 F.3d at 683.

To survive summary judgment, Hackett must first show only that she was entitled to her position; she need not prove a discriminatory motive. *Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 804 (7th Cir. 2001); *King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999). CG may counter this by presenting evidence that Hackett would not have been entitled to her position even if she had not taken leave. *Kohls*, 259 F.3d at 804. If CG can do so, Hackett bears the ultimate burden of overcoming CG's assertion by providing evidence from

11

which a reasonable jury could find that she would not have been discharged had she not taken FMLA leave. *Id.*

CG says it terminated Hackett's employment due to the elimination of her position and that it would have done so even if she had not been on FMLA leave. Hackett has provided evidence sufficient to draw into question CG's assertion that it would have terminated her even if she had not been on FMLA leave. As detailed above, Hackett has raised several genuine issues of fact as to whether or not her termination was the result of CG eliminating her position through a downsizing effort. Though proof of pretext is neither necessary nor sufficient to establish a violation of FMLA, *Ogborn v. United Food and Commercial Workers Union*, 305 F.3d 763, 769 (7th Cir. 2002), the Court may review "whether the employer's description of its reasons is honest." *Kohls*, 259 F.3d at 806 (quoting *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)). Since a reasonable fact finder could conclude that Hackett was entitled to return to her position as a consultant for CG and that she would not have been terminated had she not been on leave at the time, the Court denies CG's motion for summary judgment on count 2.

### 3. FMLA Retaliation Claim

Hackett's final claim is that CG unlawfully retaliated against her for taking FMLA leave in violation of the Act. In addition to the substantive guarantees discussed above, the FMLA contains an anti-retaliation provision that protects employees from being discriminated against for exercising their rights. *See* 29 U.S.C. § 2615(a)(1) & (2); *King*, 166 F.3d at 891. Essentially, an employer is not allowed to consider an employee's decision to take FMLA leave as a negative factor in employment decisions. 29 C.F.R. § 825.220(c). The typical issue in these cases is

"whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *King*, 166 F.3d at 891.

FMLA retaliation claims are evaluated in the same way as claims of retaliation under Title VII. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). The plaintiff can proceed by the direct method, with direct or circumstantial evidence that the employer acted for prohibited reasons, or by the indirect method. Under the indirect method, if the plaintiff establishes a prima facie case (as CG assumes Hackett can, *see* Def's Mem. at 14), and the employer articulates a noninvidious reasons for its action, the plaintiff must provide evidence from which a jury reasonably could find this reason was a pretext. If so, summary judgment is inappropriate. *Buie*, 366 F.3d. At 503.

The parties' arguments on this claim are the same as those the Court has already discussed. Hackett has provided sufficient evidence from which a rational trier of fact could infer that CG was untruthful about its proffered reasons for terminating her. The Court therefore denies CG's motion for summary judgment on count 3.

### 4.     The Counterclaim

CG counterclaims that it is entitled to an award of its costs and expenses, as well as any attorneys' fees it incurs in successfully defending Hackett's claims. CG bases its contention on a provision in Hackett's Employment Agreement with CG. The pertinent provision states, "The Employee agrees to reimburse the Employer for any attorney fees, costs and expenses incurred in its enforcing all or part of this Agreement and/or in its successfully defending all or part of any lawsuit that the Employee may file against the Employer, its members or employees. . . ." Def's Ex. 1.

According to CG, this "prevailing employer" provision is enforceable against Hackett in the context of this lawsuit. Hackett maintains that this provision is void since it would require her, as a condition of employment, to waive substantive rights granted under Title VII and FMLA, which she contends cannot prospectively be waived.

The Court believes it would be premature to rule on this issue at the summary judgment stage. The appropriate time to address the counterclaim is after a trial on the merits of Hackett's discrimination claims. If necessary, the Court will return to this issue at that time. Thus, Hackett's motion for summary judgment is denied without prejudice.

## Conclusion

For the reasons stated above, the Court denies both CG's motion for summary judgment and Hackett's motion for summary judgment [docket nos. 15, 17]. The date for filing the final pretrial order is extended to November 29, 2004. The case remains set for trial on the joint trial call to begin on January 4, 2005.

MATTHEW F. KENNELLY
United States District Judge

Date: November 1, 2004